UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____     )
UNITED STATES OF AMERICA    )
                                                     )          Criminal No. 11-40023-FDS
                    v.                              )
                                                     )
DAVID L. TOPPIN,                         )
                                                     )
                    Defendant.                )
_____     )

## UNITED STATES' TRIAL BRIEF

Defendant David L. Toppin ("Toppin" or "Defendant") is charged with a single count of

tax evasion for tax years 1997 through 1999, in violation of 26 U.S.C. § 7201.  Trial is scheduled

to begin on June 18, 2012, and the government expects it to last about five days.  Defendant is

proceeding *pro se*.  The United States respectfully submits this trial brief to outline the evidence

to be presented at trial, the charge pending against the defendant, and the more significant

evidentiary issues that may arise during the trial.

### I.        Statement of Facts

The government expects to elicit evidence of the following: Toppin was the sole owner,

operator, and employee of The Pelletizer Group, Inc., ("Pelletizer"), a company that buys and

sells machinery.  He also was the sole proprietor of a small business called Toppin Enterprises,

an Amway distributorship.  Toppin was the sole breadwinner for his family and the bulk of his

wages/business income came from Pelletizer.  Toppin's wife, Jennifer Toppin, ("Jennifer")

earned some wages over the years but was primarily a stay-at-home mother.  There is no

evidence that she is independently wealthy.

Prior to the charged tax years, Toppin had filed tax returns and paid income taxes.  In 1994, Toppin and Jennifer filed a joint return reporting taxes due of $436, which they paid.  In 1997, they filed a joint return for tax year 1994, and paid $14,689 in taxes, interest, and penalties.  That was the last time that Toppin paid any income tax and the last time, until 2006, that he filed any returns.  He had returns prepared, however.  That is, in the spring of 1998, Toppin used a CPA named Patricia Strong to prepare joint returns for tax years 1996 and 1997.  The returns showed that Toppin and his wife owed almost $120,000 in federal income taxes.  Toppin never filed these returns with the IRS.  He did, however, sign them under penalty of perjury and submit them in support of a May 1998 mortgage loan application to buy a new house for himself and his family for $700,000.  Both the deed and the mortgage for the house, located at 483 Phinney's Lane in Centerville, Massachusetts, were in Toppin's name alone.

By 2002, Toppin still had not filed his income tax returns for 1997-1999.  This was true even though he was earning significant sums from Pelletizer.  Indeed, the Pelletizer tax returns show $250,240 in ordinary income in 1997; $339,328 in 1998; and $78,411 in 1999.  In or about June 2002, the IRS notified Toppin that he had to file his delinquent returns.   Shortly thereafter, in July 2002, the defendant transferred title to the Centerville house at 483 Phinney's Lane--the house where he and his family lived and which was solely in his name--to himself and Jennifer for $1.  Later on the same day of the title transfer, they sold the house for $1.2 million.  Some of the proceeds were used the following month to buy the family's new home, located at 465 Salisbury Street in Holden, Massachusetts, for $540,000.  Even though Toppin earned the money to buy the house, the deed was put in Jennifer's name alone.

The following year, in July and August 2003, two more properties were purchased, again in Jennifer's name alone.  One of the parcels was the industrial property in Gardner,

Massachusetts where Toppin operates Pelletizer.   Even though Jennifer has nothing to do with the Gardner property, the deed is in her name alone and Pelletizer pays her "rent" every month. Jennifer also "purchased" a house in Amherst, Massachusetts from Toppin's parents.  (Toppin had previously owned this house with his father, but transferred his interest to his parents for $1 in 1990.)  The Amherst house is rental property and generally occupied by college students. Robert Jackson, the property manager, is expected to testify that he deals only with Toppin; he has never met or spoken with Jennifer; and he mails the rent checks to the Gardner address where Toppin operates Pelletizer.  Following Toppin's instructions, Mr. Jackson makes the rent checks out to Jennifer.  Even though Jennifer has nothing to do with the Amherst property, the deed is in her name alone.

Real estate was not the only asset for which title changed from Toppin's name to his wife's name.  The same happened with his bank accounts.  Prior to 2002, Toppin and Jennifer held four joint checking accounts, all at Rockland Trust in Rockland, Massachusetts.  Toppin used two of the accounts for specific purposes:  (1) one was called the "TE Account" and checks bore the name of Toppin's Amway business, Toppin Enterprises; (2) the second was called the "RE Account" and checks bore the name, "David L. Toppin, Real Estate Account."  In 2002-2003, all four accounts at Rockland Trust were closed and four new checking accounts were opened at Clinton Savings Bank in West Boylston, Massachusetts.  However, only one of the four new accounts was jointly held by Toppin and Jennifer. The other three – including the TE (Toppin Enterprises) account and the RE (real estate) account – were in Jennifer's name alone, and the defendant was not an authorized signer.  The checks for the new Toppin Enterprises account and the new real estate account bore Jennifer's name and made no mention of the defendant. The checks read:  "Jennifer Toppin, TE Account" and "Jennifer Toppin, RE

Account."  With a few small exceptions, however, all of the money going into the four new checking accounts came from Pelletizer, Toppin Enterprises, and the Amherst rental property, and more than half of the checks from outside sources which were deposited into the accounts were made payable to Toppin alone.  Furthermore, Toppin continued to use all of the accounts, signing checks on the accounts and endorsing checks that were deposited into the accounts, even though he was not an authorized signer.  It also appears, and the jury will be asked to make this comparison, that a number of the checks purportedly signed or endorsed by Jennifer were actually signed by Toppin.  The jury will be able to compare the check endorsements to the signature on a certified copy of Jennifer's driver's license and a certified copy of Toppin's driver's license, and decide for themselves whether Toppin signed checks drawn on his wife's accounts and endorsed checks payable to Jennifer that were deposited into her accounts.

Meanwhile, the IRS used the "Substitute for Return" process to estimate Toppin's overdue income taxes for 1997-1999, and in about August 2004, notified him that he owed approximately $120,000 for those years.  By December 2004, Toppin still had not filed his returns for 1997-1999, or any subsequent years, nor made any payments, and the IRS began to increase its scrutiny.  In December 2004, IRS Revenue Officer Donald Richardson summonsed the defendant to appear and to bring financial records so that a Collection Information Statement (IRS Form 433-A) could be prepared.  This form calls for the taxpayer to provide information about his/her assets, liabilities, income, and expenses.  Its purpose is to assist the IRS in determining how much of a taxpayer's liability – whether admitted on a return or assessed through a Substitute for Return – the taxpayer is able to pay.  Usually a taxpayer submits a Form 433-A in connection with an "Offer in Compromise," offering to pay an amount less than his/her actual tax liability.

4

Toppin completed the Form 433-A, signed it under penalty of perjury, and, in December 2004, sent it to RO Richardson.  The form contained many false or misleading representations. For example:  the defendant denied owning any real estate and instead said he "live[d] with relative"; he denied being self-employed or owning a business; he indicated that he earned no business or rental income; he represented that his only checking account was the one joint account with his wife at Clinton Savings Bank and the balance was only $100; and he denied transferring any asset out of his name for less than its actual value over the past ten years.  He also valued his personal assets at only $4,000 even though in his 1998 mortgage application he represented that his net worth exceeded $2.4 million, and even though in 2003 Jennifer represented on an application for a mortgage on the Holden house that she owned $150,000 in personal property.  Although the defendant filed the Form 433-A, he did not submit an Offer in Compromise.

Toppin finally filed his returns for 1997-1999, as well as for 2000-2005, in December 2006.   (He filed separately from Jennifer, who filed returns for 1997-2000 and for 2003-2005 a few months later.)  Toppin filed his 2006 return in August 2007; Jennifer filed hers in October 2007.  Toppin did not file the 1996 or 1997 returns that CPA Strong had prepared for him and Jennifer in 1998 and which he used to support his mortgage application for the Centerville house as described above.  Instead, in 2002, Toppin hired a different accounting firm to do those returns, which ultimately were prepared in 2006 by Andrew Miller, CPA.   Mr. Miller prepared all of the returns Toppin filed for 1997-2006 as well as those that Jennifer filed.  Toppin has not filed a return for 1996 or for any year after 2006.

In the returns, all of which Toppin signed under penalty of perjury, he admitted that he owed $86,909 in income taxes for 1997; $139,208 for 1998; and $1,082 for 1999.[1]  Additionally, Toppin Enterprises was listed as Toppin's Schedule C business.  Jennifer did not claim it was her business – even though since 2002, all checks on the Toppin Enterprises account had listed only her name.

After the returns were filed, IRS Revenue Officer Patricia Casey-Ortiz asked CPA Miller for a new Collection Information Statement because Miller said Toppin intended to submit an Offer in Compromise.  In February 2007, Toppin completed portions of another Form 433-A which Miller provided to Casey-Ortiz.  The 2007 form contained many of the same false or misleading representations that were on the form that Toppin filed in December 2004.  To date, Toppin has not submitted an Offer in Compromise to the IRS.

The defendant did submit an Offer in Compromise to the Massachusetts Department of Revenue, however.  Specifically, in August 2007, Toppin offered to pay $36,000 to settle his state income tax liability of more than $100,000.  In connection with that offer, he had to complete the state version of the IRS Form 433-A, which is called the Form M-433.   Miller is expected to testify about several email exchanges he had with Toppin as that form was drafted and reviewed, including emails in which Toppin expressed concern that the form listed the various real properties in Jennifer's name.

The government also intends to elicit evidence that Toppin never told the various CPAs who prepared his tax returns, the IRS, or the Massachusetts Department of Revenue, that he believed that he was not required to file returns or pay income taxes.

---

[1] The defendant also admitted in his filed returns that he owed $38,963 in income taxes for 2000; $10,187 for 2001; $21,940 for 2002; $339 for 2003; $7,082 for 2004; $11,758 for 2005; and $23,537 for 2006.

## II.        The Charge: 26 U.S.C. § 7201

Toppin is charged with one count of evading the payment[2] of federal income taxes, for tax years 1997-1999, in violation of 26 U.S.C. § 7201.  To prove its case, the government must show the following:

> First, that the defendant owed a substantial amount of federal income tax for 1997, 1998, and 1999;
>
> Second, that the defendant willfully attempted to evade or defeat the payment of his income taxes for 1997, 1998, and 1999; and
>
> Third, that the defendant committed an affirmative act, as charged in the indictment, in furtherance of his attempt to evade or defeat the payment of his incomes taxes for 1997, 1998, and 1999.

See Sansone v. United States, 380 U.S. 343, 351 (1965); United States v. Stierhoff, 549 F.3d 19, 25 (1st Cir. 2008).

Regarding the first element, the government need not prove the exact amount of taxes that Toppin owed for 1997, 1998, and 1999.  It only has to prove that the amounts were substantial.  See United States v. Sorrentino, 726 F.2d 876, 880 n.1 (1st Cir. 1984).

The second element, willfulness, is "'the voluntary, intentional violation of a known legal duty.'"  Stierhoff, 549 F.3d at 26 (quoting Cheek v. United States, 498 U.S. 192, 201 (1991)).  Congress did not limit the methods by which one may act willfully.  See id. (citing Spies v. United States, 317 U.S. 492, 499 (1943)).  "Willfulness may be inferred from 'any conduct, the likely effect of which would be to mislead or to conceal.'"  Id. (quoting Spies, 317 U.S. at 499).  Examples of willfulness include concealing assets and covering up sources of income.  See

---

[2] The First Circuit has held that 26 U.S.C. § 7201 prohibits two separate crimes:  evading the *assessment* and evading the *payment* of federal income taxes.  See United States v. Thomas, 635 F.3d 13, 16 (1st Cir. 2011).  Where, as here, a defendant is prosecuted for evading the payment of income taxes, no formal assessment is needed.  See United States v. Hogan, 861 F.2d 312, 315-16 (1st Cir. 1988).  Regardless, Toppin filed Form 1040 returns for 1997-1999 in which he admitted owing substantial amounts of federal income taxes for all three years, totaling $227,109.

Spies, 317 U.S. at 499.  Other examples include persistently failing to file income tax returns over several years, and earning substantial income over several tax years without reporting any of it.  See Stierhoff, 549 F.3d at 26-27.  Other examples of willfulness include placing assets in other people's names; depositing assets with other people; causing one's obligations to be paid through and in the name of other people; causing income to be paid through and in other people's names; and paying other creditors but not the IRS.  See Cohen v. United States, 297 F.2d 760, 762 (9th Cir. 1962); accord Sorrentino, 726 F.2d at 880 (evidence of willfulness included fact that defendant registered his assets in his friend's name).  A defendant's negative attitude toward the IRS also may serve as evidence of willfulness.  See United States v. Hogan, 861 F.2d 312, 316 (1st Cir. 1988).

The third element, an affirmative act of evasion, "requires more than the passive failure to file a tax return; it requires a positive act of commission designed to mislead or conceal." United States v. Farr, 536 F.3d 1174, 1188 (10th Cir. 2008) (internal quotation marks omitted). Using bank accounts in others' names can be an affirmative act of evasion.  See id.; United States v. McGill, 964 F.2d 222, 233 (3d Cir. 1992) ("Banking under the name of one's spouse satisfies the affirmative act requirement under § 7201.").  Filing a false Collection Information Statement (Form 433-A) also can be an affirmative act of evasion.  See United States v. Gonzalez, 58 F.3d 506, 509 (10th Cir. 1995).

### III.   Potential Evidentiary Issues

#### A. *Federal and State Tax Filing & Payment History*

The United States intends to offer evidence of Toppin's federal and state tax filing history, and that of Pelletizer, for years beyond the charged tax years.  This evidence includes years for which Toppin has never filed an individual return (1991, 1995-1996, 2007-2011) as

well as evidence that Toppin has paid no income taxes since 1997 (for the 1994 tax year).  The

government notified Toppin in its 21-day letter of its intent to do so.

To the extent that the defendant's federal and state tax filing history constitutes "other

acts" evidence extrinsic to the charged tax fraud crime, the First Circuit has held that such

evidence is admissible to prove knowledge, intent, and absence of mistake under Rule 404(b)

and that its probative value is not outweighed by the dangers of Rule 403.  Specifically, an

inference of criminal intent "can rest, in part, on a defendant's persistent failure to file income

tax returns over several years."  Stierhoff, 549 F.3d at 25; see also United States v. Johnson, 893

F.2d 451, 453-54 (1st Cir. 1990) (holding subsequent tax conduct to be admissible).  Similarly,

"one way to show that a defendant knew of his obligation to pay taxes may be to offer evidence

that he filed a tax return for a previous year."  Stierhoff, 549 F.3d at 25.  Courts also have found

that a defendant's state taxpaying history is probative of a defendant's intent in committing

federal tax crimes.  See, e.g., United States v. Magnus, 365 F.2d 1007, 1011 (2d Cir. 1966).

Here, the government seeks to introduce evidence of the defendant's federal and state tax

history to prove that he knew of his obligation to file returns and pay income taxes, because he

had done so in the past.  Further, the late-filed returns for the later tax years and the failure to file

any returns since 2007, as well as the failure to pay any taxes at all since 1997, are all probative

of his willfulness in evading the payment of his taxes for the charged tax years.

### B.  *Forms 433-A and Massachusetts Offer in Compromise*

Filing a false Collection Information Statement (Form 433-A) can be an affirmative act

of evasion.  See Gonzalez, 58 F.3d at 509  (defendant's filing of a Form 433-A on which he

failed to report substantial assets that could have been applied to his tax liability was an

affirmative act supporting his conviction for tax evasion).  Toppin's submission of the IRS Form

433-A and his Offer in Compromise to the Massachusetts Department of Revenue also is probative of his knowledge that he was required to file and to pay income taxes. And his efforts to settle his tax liability—with both federal and state authorities—belies what is anticipated to be his defense, that he did not, and does not, believe he is required to file returns or to pay income taxes.

## C. *Jennifer Toppin's returns*

As noted, the government intends to offer evidence of Jennifer's returns and taxes paid for the period 1997 to 2006. The returns are relevant to show that Jennifer either listed no occupation or "at home;" that her only Schedule C business was for an entity called "Home Health" in 1997, even though the Toppin Enterprises bank account was in her name alone as of July 2002; that she reported rents from the Gardner property (where Pelletizer is located) and the Amherst rental property beginning in tax year 2003; and that she never paid any of the taxes she reported she owed. (Thus, neither Toppin nor Jennifer paid taxes on the Pelletizer income, the Toppin Enterprises income, or the Amherst rental income.) The returns are admissible as public records under Fed.R.Evid. 803(8) and, the government expects the evidence to show, as admissions by Toppin.[3]

## D. *Self-Authenticating Documents*

The United States expects to offer a number of documents that are self-authenticating under Federal Rule of Evidence 902(4). These exhibits include:

1. Certified copies of two of Toppin's Massachusetts driver's licenses (one issued in 1998 and the other in 2003);

2. Certified copies of two of Jennifer's Massachusetts driver's licenses (one issued in 1990 and the other in 2004;

---

[3] The government anticipates that CPA Miller will testify that all of the information used to prepare Jennifer's returns was provided to him by Toppin and that he (Miller) never spoke to Jennifer.

3.  Certified copies of the May 1998 deed and mortgage for 483 Phinney's Lane in Centerville, Massachusetts;

4.  Certified copies of two deeds for 483 Phinney's Lane, both dated July 24, 2002;

5.  Certified copy of a deed for 465 Salisbury Street in Holden, Massachusetts, dated August 12, 2002;

6.  Certified copy of a deed for 4 LaChance Street in Gardner, Massachusetts, dated August 21, 2003;

7.  Certified copies of deeds for 977 N. Pleasant Street in Amherst, Massachusetts, dated December 19, 1985; May 21, 1990; and July 25, 2003;

8.  Certified copies of IRS "Certificate of Assessments, Payments and Other Specified Matters" for the defendant for each of the following years: 1990-2011;

9.  Certified copies of IRS "Certificate of Assessments, Payments and Other Specified Matters" for Jennifer Toppin for each of the following years: 1997-2011; and

10. Certified copies of IRS "Certificate of Assessments, Payments and Other Specified Matters" for the Pelletizer Group, Inc. for each of the following years:  2007-2011.

   **E.  *Summary Charts***

To streamline the trial and for the convenience of the jury, the United States expects to offer a number of charts summarizing voluminous information.  These charts will include the following:

1.  A chart summarizing information on the defendant's Form 1040 returns filed with the IRS, and the IRS "Certificates of Assessments, Payments and Other Specified Matters" for the defendant, for 1990-2011, including the fact that each filed return included a Schedule C representing that the defendant was the sole proprietor of Toppin Enterprises;

2.  A chart summarizing information on Jennifer's Form 1040 returns filed with the IRS, and the IRS "Certificates of Assessments, Payments and Other Specified Matters" for Jennifer Toppin for 1997-2011, including her representations that her occupation was "at home" and that she earned

very little income, and the fact that she reported rental income received on
the Gardner and Amherst properties;

3.   A chart summarizing information on Form 1120S income tax returns filed
by the Pelletizer Group, and the IRS "Certificates of Assessments,
Payments and Other Specified Matters" for Pelletizer, for 1997-2011;

4.   Summary charts listing certain checks written on, and certain checks
deposited into, Clinton Savings Bank accounts held in Jennifer's name
only; and

5.   A chart summarizing dates and other information pertaining to
transactions for real estate sold and/or bought in the name of Defendant, or
Jennifer, or both.

### F.  *Defendant's Exhibits*

Defendant has identified several books and videos which he intends to offer into evidence
as proof of his belief that he was not required to file returns or pay income taxes.  Circuit law
holds that where a defendant seeks admission of such material in support of his or her reliance
defense, the trial court should not admit it until the defendant takes the stand and lays the proper
foundation by testifying that he viewed and relied upon the material being offered.  See United
States v. Powell, 955 F.2d 1206, 1213-14 (9th Cir. 1992) (legal materials may be excluded where
defendant does not lay foundation by asserting claim that these are materials upon which he
relied); United States v. Willie, 941 F.2d 1384, 1391-99 (10th Cir. 1001) (defendant must lay
proper foundation establishing reliance before admission of tax protester or other legal
materials).

Here, Toppin has identified at least two videos which post-date most of his evasive
conduct and, as such, cannot have been the basis for his actions.  That is, a video called *America:
Freedom to Fascism* by Aaron Russo was released in July 2006, well after Toppin's 1997-1999
returns were due and well after the real estate and bank accounts were placed in Jennifer's name

(2002 and 2003).  Similarly, Toppin proposes to offer a video of a September 16, 2003 press conference in which then-IRS Commissioner Mark Everson was asked to respond to an assertion by tax defiers that there is no law requiring the payment of income taxes.  Again, this video is only arguably relevant if Toppin viewed it and relied on it when he decided not to file his returns, to move his assets, or to fail to pay his taxes.  And again, much of his evasive conduct occurred well prior to the date of this video.  Toppin also identifies a "Video of Senator Harry Reid" as a potential exhibit, but has not yet provided the government with any further details about the date or substance of this video.

Similarly, Toppin lists *Cracking the Code"* by Peter Hendrickson, as a potential exhibit. According to online information, this book was first printed in July 2003.  As with the video described above, this book is only relevant to the extent Toppin read it and relied on it.  And, as with the video above, much of his evasive conduct occurred prior to the book's publication.

## IV.   <u>Penalties</u>

The defendant faces the following maximum penalties upon conviction:  up to five years imprisonment, a fine of $250,000 or twice the gross/gain loss resulting from the offense, three years of supervised release, and a $100 mandatory special assessment.  In addition, the defendant may be ordered to pay restitution to the IRS.  <u>See, e.g.</u>, <u>United States v. Batson</u>, 608 F.3d 630, 635 (9th Cir. 2010).

**V.**     <u>Conclusion</u>

Although the foregoing does not exhaust all the issues that may be presented at trial, it is

submitted to assist the Court and to present the position of the United States with respect to the

above matters.

<div style="margin-left:40%;">

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:     <u>/Sandra S. Bower</u>
CHRISTINE J. WICHERS
SANDRA S. BOWER
Assistant U.S. Attorneys
U.S. Attorney's Office
John J. Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100
christine.wichers@usdoj.gov
sandra.bower@usdoj.gov

</div>

Dated:  June 11, 2012

<u>**Certificate of Service**</u>

Because the defendant refuses to accept U.S. mail or FedEx packages sent by the United
States Attorney's Office to his home address (465 Salisbury Street, Holden, MA 01520), this
document will be sent on June 12, 2012, by overnight delivery to the defendant at his business
address (4 LaChance Street, Gardner, MA 01440), and served on the defendant by email
(dave@pelletizer.com), on June 11, 2012.

<div style="margin-left:40%;">

<u>/s/Sandra S. Bower</u>
Sandra S. Bower
Assistant U.S. Attorney

</div>